ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Public Corruption and Civil Rights Section
DENNIS MITCHELL (Cal. State Bar No.: 116039)
Assistant United States Attorney
District Elections Officer
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2484
    Facsimile: (213) 894-6436
    E-mail: dennis.mitchell@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR No. 08-872-SJO |
| Plaintiff, | ) GOVERNMENT'S RESPONSE TO PRE-SENTENCE REPORT AND SENTENCING RECOMMENDATION |
| v. | ) |
| PIERCE O'DONNELL, | ) Sent. Hearing Date: 11-14-11 |
| Defendant. | ) Sent. Hearing Time: 1:30 p.m. |

The government, having reviewed the presentence report ("PSR") for defendant Pierce O'Donnell ("defendant"), hereby responds to the PSR and to the Sentencing Memorandum and Exhibits filed on behalf of defendant and makes the sentencing recommendation set forth below.

I

## GOVERNMENT'S RESPONSE TO THE PSR AND CALCULATION OF DEFENDANT'S CRIMINAL HISTORY CATEGORY

The government concurs with the factual findings set forth in the PSR and also concurs with the calculation of defendant's total offense level and criminal history category. Accordingly, the government recommends that the Court find that defendant's total offense level is 10, that his criminal history category is I, and that the applicable Sentencing Guidelines range is 6 to 12 months.

As more specifically discussed below, pursuant to the binding plea agreement entered into by defendant, defendant's counsel, and the government, the government recommends that the Court imposed the sentence agreed to by the parties, namely, a six-month term of imprisonment, a one year period of supervised release, 200 hours of community service, a $20,000 fine, and a special assessment of $50.

II

## UNDER THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a), THE SENTENCE RECOMMENDED BY THE PARTIES IS JUST AND APPROPRIATE

As the Court is aware, defendant was originally charged in an indictment with felony violations of the Federal Election Campaign Act ("FECA"). Specifically, defendant conspired to and caused both his employees and family members to make political contributions to the campaign of a candidate running for President of the United States. As part of defendant's scheme, defendant reimbursed each of those individuals for their

contributions, in violation of Title 2, United States Code, Section 441f and 437g(d).

Ultimately, the government, defendant, and defendant's counsel agreed to a pre-trial disposition by which defendant, defendant's counsel and the government entered into a binding plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C). As expressly set forth in paragraph 14 of the Agreement,

> Defendant and the USA agree that, taking into account the factors listed in 18 U.S.C. § 3553(a)(1)-(7) and the relevant sentencing guideline factors set forth above, an appropriate disposition of this case is that the court impose a sentence of: 6 months imprisonment on each of counts one and two of the information, with the sentence on each count to run concurrently; 1 year supervised release with conditions to be fixed by the Court, 200 hours of community service, the type of which shall be approved by the Court and the USAO, a $20,000 fine, and a $50 special assessment.

Plea Agreement For Defendant Pierce O'Donnell, ¶ 14.

The plea agreement and sentence set forth above were negotiated and entered into in good faith by the parties and should be accepted by the Court.

**A.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT.**

By knowingly and wilfully arranging and causing several conduit contributions to be made in violation of Federal law, defendant committed a serious offense. Simply stated, defendant's conduct undermined the integrity of the government's campaign contribution limits, and, therefore, the fairness and integrity of federal elections. Moreover, given defendant's personal history as a prominent trial lawyer, former Court of Appeals law clerk, Supreme Court law clerk, and candidate for Congress (See PSR, ¶¶ 59-61, and Exh. "A," (10-14-80 letter from

3

Federal Election Commission to Chairperson of Pierce O'Donnell Democrat for Congress)[1], defendant clearly knew better than to engage in conduct that was designed to evade the individual campaign contribution limits for a federal candidate.

The total amount of federal conduit contributions charged in the indictment was $24,000. The amount stipulated to by the parties is $20,000. Either of those amounts surpasses the felony threshold limit set forth in 2 U.S.C. § 437g(d) which provides a two-year felony for conduit contributions which exceed $10,000 in a calendar year.

Finally, it should be noted that defendant's conduct not only affected himself. While defendant asserts that the employees of his law firm willingly went along with defendant's request for contributions, the government is aware of at least one employee, E.L., who objected to defendant's employees being asked to make a contribution. See Exhibit "B," (FBI 302 of E.L. dated 3-27-08). E.L. elected to ask others outside defendant's law firm to make conduit contributions in order to avoid defendant's employees from being asked to do so. (Id.)

B. **THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE (18 U.S.C. § 3553(a)(2)(A)).**

A six month term of imprisonment is clearly appropriate to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for defendant's actions. The insidious nature of this offense - unlawfully causing and

---

[1] The subject of the letter is not relevant to this proceeding. It is only attached to corroborate the fact that defendant was a candidate for Congress in 1980.

financing political contributions in the names of others - is serious. Moreover, a sentence of imprisonment will promote respect for the law by, among other things, showing others who participate lawfully in the political process by contributing within their individual limit the consequences of evading those those statutory limits.

Finally, a six-month sentence provides just punishment in this case. Defendant has had the good fortune to become a prominent and successful lawyer and to have held very prestigious positions within the federal court system, namely, serving as a law clerk at the U.S. Court of Appeals and at the U.S. Supreme Court. Defendant even ran for a seat in Congress. When a defendant with that personal history knowingly and wilfully abuses the federal election process as in this case, a sentence of imprisonment provides just punishment.

C. THE NEED TO AFFORD ADEQUATE DETERRENCE TO CRIMINAL CONDUCT AND TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT (18 U.S.C. § 3553(a)(2)(B) and (C)).

While it may be unlikely that defendant will commit future criminal conduct, a sentence of six months imprisonment is nevertheless needed to afford sufficient deterrence to others, particularly those with the financial means to illegally finance contributions being made in the names of other persons, from engaging in similar conduct. It is important to let such persons know that engaging in this type of offense may very well result in a conviction that includes a term of imprisonment.

D. **THE NEED TO PROVIDE THE DEFENDANT WITH NEEDED EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER (18 U.S.C. § 3553(A)(2)(D))**

Defendant is a highly educated individual who does not need further education or vocational training. Accordingly, this factor should not play a significant role in influencing the Court on whether to accept or reject the parties' plea agreement.

E. **THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT AND THE NEED TO PROVIDE RESTITUTION TO ANY VICTIMS OF THE OFFENSE (18 U.S.C. § 3553(a)(6) and (7)).**

Restitution is not at issue in this case. Admittedly, defendant was charged with felony violations of federal election law and could have been prosecuted under those charges. Nevertheless, the facts and circumstances of this case, including defendant's willingness to enter into a binding plea agreement under which he has agreed to, among other things, a six-month term of imprisonment, have persuaded the government that the agreed-upon sentence of the parties is appropriate and should be imposed by the Court.

## III

## CONCLUSION

Pursuant to the parties plea agreement, and for the reasons set forth above, the government recommends that defendant be sentenced to concurrent terms of 6 months imprisonment on counts one and two of the first superseding information, one year of

1  supervised release, 200 hours of community service, a $20,000
2  fine, and a $50 special assessment.
3
4                                  Respectfully Submitted,
5                                  ANDRÉ BIROTTE JR.
                                   United States Attorney
6
                                   ROBERT E. DUGDALE
7                                  Assistant United States Attorney
                                   Chief, Criminal Division
8
                                   LAWRENCE S. MIDDLETON
9                                  Assistant United States Attorney
                                   Chief, Public Corruption and Civil
10                                 Rights Section
11
    DATED: 10-31   , 2011          /s/ Dennis Mitchell
12                                 _____
                                   DENNIS MITCHELL
13                                 Assistant United States Attorney
                                   District Elections Officer
14
                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA
15

7

# Exhibit A



FEDERAL ELECTION COMMISSION
Washington, DC  20463

October 14, 1980

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

ADVISORY OPINION 1980-115

Ms. Judith Boggs
Chairperson
Pierce O'Donnell Democrat for Congress
106 N. Allen Avenue, Suite 202
Pasadena, California 91104

Dear Ms. Boggs:

 This responds to your letter of September 16, 1980 requesting an advisory opinion concerning application of the Federal Election Campaign Act of 1971, as amended ("the Act") to the payment of compensation to Mr. O'Donnell by his law firm.

 You state that Mr. O'Donnell is an attorney, a partner in a Los Angeles law firm, and a 1980 congressional candidate. The law firm desires to continue to distribute to Mr. O'Donnell his regular monthly and quarterly advances against his share of the firm's profits. However, the firm wishes to avoid making a contribution to the O'Donnell campaign, as the firm believes such contribution should be made on an individual basis.

 Mr. O'Donnell's percentage ownership interest in the firm's profits (or losses) was set at a partnership meeting held in January of 1980. A similar meeting is held each January. This percentage of participation is based on a wide variety of factors, including seniority of service in the firm, stature in the Bar, number of client billable hours, results achieved for clients, ability to attract clients, effectiveness in problem solving, value as an advisor to other attorneys in the firm, and other considerations.

 At the end of 1979, Mr. O'Donnell's firm set informal targets for its attorneys regarding the number of billable hours of client work projected for the next calendar year. This target is not a requirement, and attorneys in the firm have sometimes fallen below targets set for past years.

No monetary penalty has ever been imposed on any partner for failure to reach a targeted figure. In Mr. O'Donnell's case, the target for 1980 is 1600 hours. This represents the highest level set by the firm and was set without consideration of his potential candidacy. As of the end of July, Mr. O'Donnell had already billed 1,019 hours of client work - a figure in excess of the targeted rate of 933 hours for the first months of the year.

    Mr. O'Donnell plans to continue to participate in his law practice during the period leading up to the November 1980 election. He will be maintaining responsibility for, and will make court appearances in connection with, the major litigation matter on his calendar. He will also be available to consult with his partners on other matters. However, Mr. O'Donnell will be necessarily spending the majority of his time in the coming weeks on his election campaign, and the number of client hours he works will be substantially reduced during that period. You add that it is possible that the total number of hours Mr. O'Donnell works for the calendar year may fall somewhat below the targeted figure.

    Mr. O'Donnell's firm has a long history of encouraging and affording the opportunity for its attorneys to engage in various forms of pro bono publico, bar association, and public service activities, including active involvement in elective politics. Attorneys from the firm (including Mr. O'Donnell) have regularly devoted substantial amounts of time to such activities in the past, at the expense of the hours they could devote to client work, without any adverse effect on their receipt of their usual distribution from the firm.

    In January of each year, the partnership makes a final review and determination of each partner's income for the just completed calendar year. Ordinarily, if there is additional income for distribution (other than monthly and quarterly distributions), the partners receive any such distributions on the basis of their ownership percentage interest in the firm. In the past, adjustments have been made in the final year-end distribution for a variety of reasons. Mr. O'Donnell's final year-end distribution, if any, will be governed by the partnership's established adjustment review practice outlined above. At that time, the number of hours billed by Mr. O'Donnell in 1980 will be considered, along with a number of other factors, including an overall assessment of Mr. O'Donnell's past and anticipated future contributions to the firm, results obtained for clients, and the fact that Mr. O'Donnell's client billable hours for 1979 were among the highest of any of his partners. You further add that at the present time, it cannot be predicted whether a reduced number of billable hours in 1980, if it occurs, will have any material effect on Mr. O'Donnell's final year-end distribution of partnership profits.

    Under these circumstances you ask whether Mr. O'Donnell may continue to receive his regular monthly and quarterly distributions as an advance against his share of firm profits, despite the time away from his practice that his campaign will require, without the firm or the other partners being deemed to have made a contribution to his campaign.

    Commission regulations define as personal funds "salary and other earned income from bona fide employment." 11 CFR 110.10(b)(2). An employer who pays compensation to an employee while that employee is a candidate for office is not considered to have made a

contribution to that individual's campaign so long as there is a bona fide employment relationship that exists between the candidate and his/her employer for a purpose genuinely independent of his/her candidacy, and provided that any compensation paid to the candidate is exclusively in consideration of employment services performed by him. See Advisory Opinion 1977-68, copy enclosed.

As recognized in your request, the Commission in Advisory Opinion 1979-58, which concerned political activity on behalf of a presidential committee by a senior partner in a law firm during normal business hours, considered a number of factors to conclude that the income paid by the firm to the partner did not constitute an in-kind contribution to the Committee. There the request represented that the partner's compensation was not tied to the number of hours worked but, rather, was based on a proprietary interest in the firm which reflected a number of other factors. That request also represented that the partner had complete discretion in the use of his/her time and that no reduction of income from the firm would be made even if, for whatever reason, the partner spent less time on firm matters than may have been spent during a previous period when no services were provided to the committee. That opinion, however, specifically distinguished the situation presented here and in Advisory Opinion 1978-6, where the compensation from the law firm was dependent, at least in part, on the number of hours the partner recorded as client work for the firm.

In Advisory Opinion 1978-6 (copy enclosed) the Commission concluded that where compensation is at least partially based on the number of hours "recorded on client work in the office", an in-kind contribution from the law firm to the partner/candidate would result if the compensation from the firm were not reduced to reflect the lower number of hours worked for the firm because of that candidacy.

Because compensation paid to Mr. O'Donnell is dependent in part on the "number of client billable hours," the Commission concludes that Advisory Opinion 1978-6 is applicable to the situation presented here, and that Advisory Opinion 1979-58 is distinguishable. Accordingly, the Commission concludes that to the extent compensation paid to Mr. O'Donnell from the firm is not reduced to reflect the lower number of hours he will work for the firm because of his candidacy, there is a contribution from the firm to Mr. O'Donnell's campaign unless there is an indication that Mr. O'Donnell's value to the firm throughout the year has increased to offset the reduction in Mr. O'Donnell's client billable hours. This contribution is subject to the limitations and the reporting requirements of the Act. See 2 U.S.C. 434, 441a; 11 CFR 104, 110, especially 110.1(e): contributions by a partnership. The partnership contribution includes, of course, any increase in the firm's overhead or operating costs which are attributable to Mr. O'Donnell's campaign. See 11 CFR 100.7(a)(1)(iii).

      This response constitutes an advisory opinion concerning application of the Act, or regulations prescribed by the Commission, to the specific transaction or activity set forth in your request. See 2 U.S.C. 437f.

                                          Sincerely yours,

                                          (signed)

                                          Max L. Friedersdorf
                                          Chairman for the
                                          Federal Election Commission

Enclosures

P.S. Commissioner Reiche voted to approve this opinion and will be filing a statement of his concurring views at a later date.

# Exhibit B

FD-302 (Rev. 10-6-95)

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription   03/27/2008

E████ L████████, born on 8/18/1952, was interviewed via telephone. Present on the conference call and representing L████████ was attorney James Anklam of the law firm Paul, Hastings, Janofsky & Walker LLP, 875 15th Street, N.W., Washington D.C., 20005. Also present and participating in the interview was Assistant United States Attorney Dennis Mitchell. At the start of the interview, a three page letter immunity agreement, which was signed by L████████, Anklam and AUSA Mitchell, was reviewed. After being notified of the identities of the interviewers and the purpose of the interview, L████████ provided the following information:

L████████ stated she understood the contents of the letter immunity agreement, understood she was to provide truthful information, and understood her statements could not be used against her.

L████████ received copies of documents given to her attorney by AUSA Mitchell. The documents were identified using her initials and a number.

L████████ reviewed document EL1, a copy of check 1692. L████████ recognized this as a check from her account, and recognized her signature on the check. The check was made payable to ██████ for President, and was her contribution to the ██████ campaign for which she was reimbursed.

L████████ reviewed document EL2, a check from the account of PIERCE O'DONNELL written to her for $8,000. L████████ remembered receiving this check as a reimbursement of the money she contributed to the ██████ campaign. She recognized her signature endorsing the check. She usually deposited checks in her bank account in S████████, an account she still has today.

L████████ said D████ V████ asked her to make a contribution to the ██████ campaign, and she would be reimbursed. L████████ does not recall the specific words used in the conversation, but knew she would be reimbursed. She was not sure who would pay her back, but assumed it would be O'DONNELL because he was the firm. She did not have enough much money in her account at that time to cover a $2,000 check.

---

Investigation on  3/25/2008   at  Los Angeles, CA   (telephonically)

File #  56C-LA-246659 -29   Date dictated

by  Dane B. Costley

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

D-302a (Rev. 10-6-95)

Continuation of FD-302 of ____E▓▓ L▓▓▓▓▓▓▓▓▓▓____ , On __3/25/2008__ , Page __2__

    L▓▓▓▓▓▓ caused others to contribute to the Edwards campaign. She did not feel it was right to ask employees for money. She was asked to make a contribution to the ▓▓▓ campaign previously, and was reimbursed for that contribution. She felt everyone has different political views, and it was not right to impose on the employees and make them contribute to any political campaign. Since this was a fund raiser, other people could be approached that were not employees. She asked her mother, A▓▓▓ L▓▓▓▓▓▓, to make a contribution.

    When she was approached to make a contribution to the ▓▓▓▓ campaign and was reimbursed, L▓▓▓▓▓▓ did not think it was illegal to be reimbursed for a contribution. When she was approached to make a contribution to the ▓▓▓▓▓▓ for President campaign, she still did not know it was illegal to be reimbursed. L▓▓▓▓▓▓ has her legal residency card but does not vote. She knew O'DONNELL was an attorney and thought he knew what he was doing, and wanted to be a big shot.

    L▓▓▓▓▓▓ reviewed document EL3, a deposit ticket. L▓▓▓▓▓▓ recognized her handwriting on the deposit ticket. She remembered the money was deposited into her bank account, but she did not know if she made the deposit using a bank teller or using the ATM.

    L▓▓▓▓▓▓ reviewed document EL4. L▓▓▓▓▓▓ recognized check #1708 as a check she wrote from her bank account to A▓▓ L▓▓▓▓▓▓. When ▓▓▓▓▓▓▓▓ received the $8,000 check from the account of O'DONNELL, she wrote this check to reimburse her mother. L▓▓▓▓▓▓ recognized her signature on the check, and stated the endorsement looked like her mother's endorsement.

    L▓▓▓▓▓▓ reviewed document EL5. L▓▓▓▓▓▓ recognized check #1709 as a check she wrote to JA▓▓▓▓▓ S▓▓▓▓ F▓▓▓▓▓ reimbursing ▓▓▓▓▓ for a $2,000 contribution she made to the ▓▓▓▓▓▓ for President campaign. L▓▓▓▓▓▓ remembered F▓▓▓▓ made a contribution, but did not remember if she solicited F▓▓▓▓ or if her sister made the request. L▓▓▓▓▓▓ recognized the writing on the check as her writing, and noted it was her idea to have J▓▓▓▓▓▓ and R▓▓▓▓L F▓▓▓▓ make contributions.

    L▓▓▓▓▓▓ reviewed document EL6. L▓▓▓▓▓▓ recognized check #1710 as a check she wrote to R▓▓▓▓ F▓▓▓▓ reimbursing him for his contribution to the ▓▓▓▓▓ campaign. L▓▓▓▓▓▓ recognized