ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
LAWRENCE S. MIDDLETON (Cal Bar No. 157866)
DENNIS MITCHELL (Cal. Bar No. 116039)
Assistant United States Attorneys
1300 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-2484
Facsimile: (213) 894-6436

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR 08-872-SJO |
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 1 TO BAR IRRELEVANT AND PREJUDICIAL TESTIMONY FROM CONDUIT WITNESSES; EXHIBIT "A" |
| v. | |
| PIERCE O'DONNELL, | |
| Defendant. | HEARING DATE: 1-17-12 |
| | HEARING TIME: 9:00 a.m. |

I

**INTRODUCTION AND FACTUAL BACKGROUND**

Plaintiff United States of America, by and through its counsel of record, the United States Attorney's Office for the Central District of California, hereby submits its brief in opposition to defendant's motion to bar alleged irrelevant and prejudicial testimony from conduit witnesses.

Defendant has been charged with federal felony violations of federal election law, namely, the prohibition against making conduit contributions set forth in 2 U.S.C. §§ 441f, 437g(d). As

set forth in the Indictment conspired to violate the conduit contribution prohibition and, in fact, made several conduit contributions to a candidate running from President of the United States.

## II

### TO THE EXTENT THAT DEFENDANT WAS AWARE OF ANY CONDUIT CONTRIBUTOR'S OBJECTION TO MAKING CONDUIT CONTRIBUTIONS FOR DEFENDANT, SUCH EVIDENCE IS RELEVANT AND ADMISSIBLE

Defendant only refers to one example of the alleged irrelevant testimony of a conduit witness, namely, EL. Specifically, defendant seeks to exclude statements from EL that pertain to EL feeling either pressured by defendant to make conduit contributions. At the sentencing hearing on November 14, 2011, the government indicated that EL resented having to make conduit contributions for defendant, and that she felt it was inappropriate for employees to have to make conduit contributions. See Pages 17-18 of Transcript attached as Pages 72-73 of Exhibit C to Defendant Motion in Limine No. 2.

Significantly, EL communicated her objection to having to make conduit contributions to defendant's assistant and co-conspirator, DV. EL complained when she was informed by DV that defendant wanted his staff to make conduit contributions to a Presidential candidate.[1] During a deposition taken by the

---

[1] The term "Presidential candidate" has been used instead of identifying the particular candidate who received the conduit contributions. Because defendant's co-conspirator was not charged in this case, the initials "DV" have been used instead of the co-conspirator's name.

2

Federal Election Commission on June 26, 2006, EL testified as follows:

> Q: And did you make a contribution to [the Presidential candidate]?
>
> A: Yes.
>
> ...
>
> Q: And how did you come to make this contribution?
>
> A: [DV] came into my office and told me that - I believe she said that Pierce had pledged some money and that she was asked to have the employees contribute to fulfill the amount of money that was pledged.
>
> ...
>
> Q: Okay. When [DV] asked you to do this -
>
> A: Yes.
>
> Q: - what happened next after you had this conversation? What did you do after the conversation?
>
> A: When she came in to me about this, I-I had told her that I was really upset that he wanted her to go ask employees for - for another contribution to someone. No. 1, again, you know I think that's really a personal issue, the politics, and I don't think anyone should be asked to do anything like that. Because politically, No. 1 again, I certainly didn't like this guy, and if I were to

3

|   |   |   |
|---|---|---|
| 1 | | contribute, it wouldn't have been to him. |
| 2 | | But I felt that the employees shouldn't be put in |
| 3 | | that position because I know I felt that if I |
| 4 | | didn't do something he would be angry with me. So |
| 5 | | I could imagine that they must be feeling the same |
| 6 | | way, that pressure, and I just didn't feel it was |
| 7 | | right. |
| 8 | Q: | Did you say anything else to [DV]? |
| 9 | A: | Yeah. I told her to please go talk to him about |
| 10 | | this. |
| 11 | | . . . |
| 12 | Q: | And when you asked her to talk to Pierce about |
| 13 | | this, what did she say in response to that? |
| 14 | A: | She did. She turned around and she said I will. |
| 15 | | And then she went into his office evidently, but I |
| 16 | | don't know when or when she talked to him. I just |
| 17 | | said please go to talk with him. That you |
| 18 | | shouldn't have to do this. You shouldn't have to |
| 19 | | ask people. |
| 20 | Q: | And did she report back to you after she spoke |
| 21 | | with him? |
| 22 | A: | She came back to my office. And then again, I |
| 23 | | don't know when. I don't know if it was an hour |
| 24 | | later or if it was - I don't remember, but she |
| 25 | | came back and said that she talked to him, and he |
| 26 | | said that she needs to do what he asks her to do, |

1          her job.

2          . . .

3      Q:     And what did you do next?

4      A:     I came up with the idea, so we don't have to ask the employees, that we would just - I asked my mom. And I said, you know, maybe I can have my sister write a check.

See attached Exhibit "A," Pages 66-70 of Transcript dated June 26, 2006.

    Despite defendant's contention, EL's testimony is relevant. First, defendant has put his mental state at issue. Defendant asserts that due to having bi-polar disorder he could not harbor the requisite intent to be criminally liable for the conduit contributions he caused. Defendant may argue that his mental condition prevented him from being able to comprehend or be aware that he was violating the law when he made the conduit contributions. Therefore, to the extent that defendant was made aware of an employee's objection to engaging in conduit contributions, that evidence is clearly relevant with respect to defendant's state of mind at the time he was conspiring with DV and at the time he caused the conduit contributions in this case.

    Second, EL's testimony puts into context how certain individuals, who were not employed by or related to defendant, such as EL's mother and EL's friends, JF and RF, made conduit contributions to a Presidential candidate that were engineered by defendant. Those contributors were reimbursed by EL, who in turn

received that money from defendant, via DV. Accordingly, EL's testimony pertaining to any resentment she had with the firm's employees being asked to make conduit contributions is clearly relevant to show how the conduit contributors were selected and solicited to make conduit contributions.

In addition, to the extent that any employee who acted as a conduit contributor and believed that it was improper to make a conduit contribution, a jury should be able to consider that fact in determining the likeliness that someone in defendant's position would know that it was wrong to make conduit contributions to the Presidential campaign.

Finally, defendant cannot point to any unfair prejudice that would result from the foregoing statements by EL. EL's statements are relevant to show defendant's state of mind and to show how some conduit contributors became involved in the offenses charged against defendant. Accordingly, EL's statements should be admissible under Fed. R. Evid. 403.

## III.

## CONCLUSION

For the reasons set forth above, defendant's Motion In Limine No. 1 should be denied.

                        Respectfully Submitted,

                        ANDRÉ BIROTTE JR.
                        United States Attorney

                        ROBERT E. DUGDALE
                        Assistant United States Attorney
                        Chief, Criminal Division

DATED: *1-3*, 2012    /s/ Dennis Mitchell
                        DENNIS MITCHELL
                        LAWRENCE S. MIDDLETON
                        Assistant United States Attorneys

                        Attorneys for Plaintiff
                        UNITED STATES OF AMERICA

# Exhibit A

BEFORE THE FEDERAL ELECTION COMMISSION

In the Matter of )
) MUR 5758
)

DEPOSITION OF ELSE LATINOVIC

JUNE 26, 2006

REPORTED BY GRISELDA R. CABANGON-OLSON, CSR NO. 8585

Page 66

1  more about that. Did you actually attend that?
2     A  No, I didn't go to that breakfast.
3     Q  Do you know who did attend that?
4     A  No, I don't know.
5     Q  Do you know whether other firm employees
6  attended?
7     A  I don't know who -- no.
8     Q  And did you make a contribution to John Edwards?
9     A  Yes.
10    Q  And I'd like to show you what we've previously
11 marked as Exhibit No. 6.
12    A  Okay.
13      (Federal Exhibit 6 was marked
14 for identification and is included herewith.)
15 MR. BARCELLA: You've got big checks, Else.
16 THE WITNESS: Yeah. I don't need my glasses.
17    Q  BY MR. LEVINE: This is what appears to be a
18 check dated March 31st, 2003, to Edwards for President
19 for $2,000
20    A  Uh-huh.
21    Q  Is this the contribution check that you wrote?
22    A  Yes. It looks like it is.
23    Q  And how did you come to make this contribution?
24    A  Dolores had come into my office and told me
25 that -- I believe she said that Pierce had pledged some

Page 67

1  money and that she was asked to have the employees
2  contribute to fulfill the amount of money that was
3  pledged.
4     Q  Did she say anything else to you?
5     A  That she was very unhappy that she was requested
6  to do this.
7     Q  Anything else?
8     A  She was just not happy to do this.
9     Q  And what was the timing between when you wrote
10 the Hahn check and you wrote this check to John Edwards?
11    A  Oh, boy. I don't know. There was -- there was
12 time in between, but I couldn't tell you, you know, the
13 period of time.
14    Q  And directing your attention back to this
15 check --
16    A  Yes.
17    Q  -- there's a number written on the memo line.
18    A  Oh. Yeah.
19    Q  What -- do you know what that number is?
20    A  No. I have no idea. And that would not be my
21 handwriting.
22    Q  That number is not your handwriting?
23    A  I don't believe that's my handwriting. No.
24    Q  Okay. When Dolores Valdez asked you to do
25 this --

Page 68

1     A  Yes.
2     Q  -- what happened next after you had this
3  conversation? What did you do after the conversation?
4     A  When she came in to me about this, I -- I had
5  told her that I was really upset that he wanted her to go
6  ask employees for -- for another contribution to someone.
7       No. 1, again, you know, I think that's really --
8  that's a personal issue, the politics, and I don't think
9  anyone should be asked to do anything like that. Because
10 politically, No. 1, again, I certainly didn't like this
11 guy, and if I were to contribute, it wouldn't have been
12 to him.
13      But I felt that the employees shouldn't be put
14 in that position because I know I felt that if I didn't
15 do something he would be angry with me. So I could
16 imagine that they must be feeling the same way, that
17 pressure, and I just didn't feel it was right.
18    Q  Did you say anything else to Dolores Valdez?
19    A  Yeah. I told her to please go talk to him about
20 this.
21    Q  And was there anything else that you said to her
22 at that time?
23    A  I think -- I think that might be it. I don't
24 recall. You know, if I did, I don't recall. That's the
25 main thing of -- I mean when she walked in, that was my

Page 69

1  reaction. I can't believe this, you know. We have to
2  ask employees for something.
3     Q  And when you asked her to talk with Pierce about
4  this, what did she say in response to that?
5     A  She did. She turned around, and she said I
6  will. And then she went into his office evidently, but I
7  don't know when or when she talked to him. I just said
8  please go talk with him. That you shouldn't have to do
9  this. You shouldn't have to ask people.
10    Q  And did she report back to you after she spoke
11 with him?
12    A  She came back to my office. And then again, I
13 don't know when. I don't know if it was an hour later or
14 if it was -- I don't remember, but she came back and said
15 that she talked to him, and he said that she needs to do
16 what he asks her to do, her job.
17    Q  Do you know whether Dolores specifically
18 mentioned your name when she spoke with Pierce O'Donnell?
19    A  I don't know what happened in that room. I just
20 know that that's what she told me. I don't know if she
21 said, you know, Else said you can't ask employees to do
22 this or if she just said, you know, Pierce, this isn't
23 right going to employees and bothering them again. I
24 don't know what happened in that room.
25    Q  And did Dolores say anything else to you after

18 (Pages 66 to 69)

Page 70

1  that conversation with — that she had with Pierce
2  O'Donnell?
3    A  No. I mean she came back and told me that. And
4  then I said to her, I said, well, I feel I think it's
5  wrong to ask employees to have to do this.
6    Q  And what did you do next?
7    A  I came up with the idea, so we don't have to ask
8  the employees, that we would just — I asked my mom. And
9  I said, you know, maybe I can have my sister write a
10 check.
11   Q  Did Dolores ask you to do that?
12   A  No. No, she didn't ask me to do that. That was
13 my own brilliant idea. I mean I just didn't feel that
14 she should have to go to employees, and I didn't — I
15 just thought that would be the best way to handle this.
16 Because I felt that he made it very clear that she needed
17 to do her job and that he would be very unhappy if it
18 wasn't fulfilled.
19   Q  Did you know how many contributions she had to
20 get?
21   A  No. I don't recall what the amount was that he
22 had pledged that he was short of. She may have told me a
23 figure, but I have to — at this time I don't remember.
24 I just know that I said, well, perhaps I can do this and
25 do that.

Page 71

1    Q  And what did she say in response to that?
2    A  I think she just said okay. Okay. I mean I
3  don't know word for word. It's so long ago.
4    Q  I understand that. The gist of the conversation
5  is fine.
6    A  I know.
7    Q  And what did you do next after that
8  conversation?
9    A  I think I — I think I called my mom. I think I
10 called my mom at home, or I may have just gone home and
11 talked to my mom and said Pierce pledged money once again
12 to something that he can't fulfill and now he needs help
13 to make that promise, you know.
14      And I think my mom said, well, why is he doing
15 that?
16      And I think I said — I'm like he's being a big
17 shot one more time, you know.
18      And again, that was before we knew anything
19 about Hahn and everything. So it was just —
20   Q  So this was before that meeting when you learned
21 about the Hahn contribution charges?
22   A  Yes. Yes. Yeah.
23   Q  And did your mother say anything else to you
24 when you asked her to contribute?
25   A  I don't recall. No, I don't recall if she said

Page 72

1  anything. I mean my mom is an older lady, and you know,
2  she just — you know, she knows Pierce is very eccentric
3  and he gets involved in writing books, making movies,
4  this and that. So she doesn't think anything out of the
5  ordinary for him to have a politician in the office or
6  having a fundraiser. She just looked at him as a person
7  who does many, many things in his career. And she knows
8  that, you know, I felt like I was on the spot.
9       I think I might have said, you know, I feel like
10 if I don't do this I think he'll be mad that I'm not
11 being cooperative or something like that. But again, I
12 don't remember word for word.
13   Q  Did Dolores Valdez give you a deadline by which
14 time you needed to get these contributions?
15   A  You know, I — if she mentioned a time I don't
16 recall what that was or if she said it. I think it was
17 more or less this is what was pledged and he doesn't have
18 the money. And that was it.
19   Q  So after you spoke with your mother about
20 this —
21   A  Yeah.
22   Q  — what happened next?
23   A  Well, I had — I had written a check. And — so
24 my mom wrote a check, and then two other people wrote a
25 check, and I gave that. I gave those checks to Dolores.

Page 73

1    Q  And did this happen the same day that Dolores —
2    A  No. I think this was over a period of days.
3  But I don't recall how many days.
4    Q  And who else did you get to contribute to the
5  Edwards campaign? You said there were two other people.
6    A  Right. Russ and Jackie. I didn't talk to them
7  directly. It was like — I called my mom. Oh, I think I
8  called my sister. And I told her the situation that
9  Pierce has pledged some money and he doesn't have enough
10 money and that I don't want — I think I might have
11 mentioned that I don't want to have Dolores — that she
12 should go bother the employees. And so I thought that it
13 would be just easier to do it this way.
14   Q  And what is your sister's name?
15   A  Hanna.
16   Q  Does she have the same last name as you?
17   A  No. Franklin.
18   Q  Franklin?
19   A  Yeah.
20   Q  And when you — you spoke with her over the
21 phone about this?
22   A  Yes, I believe it was over the phone.
23   Q  And did you ask her to contribute?
24   A  Yes. I think I said can you write a check or
25 maybe Russ or something? And then when we called — when

19 (Pages 70 to 73)